## PUEBLO OF SANTA ROSA v. FALL, Secretary of the Interior, et al.

(Court of Appeals of District of Columbia. Submitted Feb. 2, 1926. Decided April 5, 1926. Petition for Rehearing and Modification Denied April 24, 1926.)

No. 4298.

**1. Attorney and client ⬅71—Counsel's right to appear for litigant held improperly challenged by motion to dismiss, and improperly determined as part of case on merits.**

Question of counsel's right to appear for litigant *held* improperly challenged by motion to dismiss, and improperly determined as part of case on merits.

**2. Attorney and client ⬅70.**

Counsel will be presumed to appear by proper authority until the contrary is shown, which presumption cannot be overcome by collateral attack in pleadings.

**3. Attorney and client ⬅71.**

Challenge to counsel's right to appear for litigant is preliminary matter, to be disposed of before proceeding to merits.

**4. Public lands ⬅223(1)—"Pueblo" means small settlement, and applies whether people be Spaniards or Indians.**

"Pueblo," under Spanish law, means a small settlement or gathering of people, a steady community, and applies equally, whether settlement be a small collection of Spaniards or Indians.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Pueblo.]

**5. Public lands ⬅223(1)—Pueblo, though possessed of prescriptive rights, held not entitled to injunction restraining Secretary of the Interior from opening lands to sale, entry, and settlement (Gadsden Treaty, art. 6 [10 Stat. 1035]; Treaty of Guadalupe Hidalgo Feb. 2, 1848, art. 9 [9 Stat. 930]).**

Papago Indians, composing the pueblo of Santa Rosa, Ariz., and possessed of prescriptive right to lands under Mexican and Spanish laws, but without paper title, *held* not entitled to injunction restraining Secretary of the Interior from opening lands to sale, entry, and settlement, in view of Gadsden Treaty, art. 6, as to recognition of grants, and notwithstanding Treaty of Guadalupe Hidalgo Feb. 2, 1848, art. 9.

**6. Adverse possession ⬅4.**

Prescriptive right, as against the crown, existed and was recognized by Spanish laws.

Appeal from Supreme Court of District of Columbia.

Suit by the Pueblo of Santa Rosa against Albert B. Fall, Secretary of the Interior, and another. From a decree dismissing the bill, plaintiff appeals. Affirmed.

L. H. David, of Washington, D. C., W. C. Reid, of Albuquerque, N. M., and Louis

Kleindienst, of Los Angeles, Cal., for appellant.

H. L. Underwood, of. Washington, D. C., and G. A. H. Fraser, of Denver, Colo., for appellees.

Before MARTIN, Chief Justice, and ROBB and VAN ORSDEL, Associate Justices.

VAN ORSDEL, Associate Justice. Plaintiff, the pueblo of Santa Rosa, filed a bill in equity in the Supreme Court of the District of Columbia to restrain defendants, the Secretary of the Interior and the Commissioner of the General Land Office, from opening its lands to sale, entry, and settlement, as public lands of the United States.

It is averred in the bill that the lands were granted and conceded to the pueblo of Santa Rosa "by the laws and customs of the Indians, antedating the Spanish discovery of America, and also by the laws of Spain and Mexico"; that the lands involved were part of the territory ceded by Mexico to the United States under the Gadsden treaty; that the inhabitants of this pueblo have lived in communal life from time immemorial, and have governed their community with definite customs, having the force of law, which have been obeyed by the inhabitants; that they assemble in common council ·at stated intervals, where the adult inhabitants of the pueblo legislate on matters concerning its inhabitants, and establish rules and decisions for its government, having the force of law.

It is further averred that Spain and Mexico, prior to the cession to the United States, at all times conceded to plaintiff from time immemorial the right to have a common name; the right to take, hold, manage, control, and dispose of real and personal property; the right to contract as a corporate entity by resolutions passed in common council, and through its officers and representatives, in all matters concerning its interests, property, and affairs; the right to have perpetual succession; the right to sue and be sued as a corporate entity, and to appear and act as such in the courts, and with government authorities; the right and power to generally maintain a permanent organized government, and to make rules and laws binding upon the pueblo and its inhabitants, and to elect officers who shall exercise such power and jurisdiction over the pueblo and its property and inhabitants as may be provided by the laws, rules, and decisions enacted at the common councils of its inhabitants.

It is also averred in the bill that the plaintiff is in all respects similar to the Pueblo Indian towns in Mexico, existing at the time of the Spanish discovery of America; that Spain, during all the period of its sovereignty over the territory, and at all times, recognized the ownership of the lands herein described by the pueblo of Santa Rosa; that Mexico likewise recognized plaintiff's ownership of the land described during the period of Mexican sovereignty, and recognized its inhabitants as Mexican citizens, enjoying all the property rights accorded citizens of Mexico; and that such ownership and recognition by Mexico existed at the time of the cession to the United States of the territory embracing the lands in question.

It is then averred that in 1909 the Secretary of the Interior designated plaintiff's lands as subject to entry under the Enlarged Homestead Act of February 19, 1909 (Comp. St. §§ 4563–4568a); that plaintiff in 1914 petitioned the Secretary to abstain from listing for entry, or sale, as part of the public domain, any of the lands belonging to plaintiff; that the Secretary, on June 11, 1914, replied, denying plaintiff's request, on the ground that the inhabitants of the pueblo had not such property right in the lands as was provided for and protected by the treaty, and held that the inhabitants of the pueblo had only such rights in the use of the land as belongs to the nomadic Indian tribes. Plaintiff prayed generally that defendants be restrained from treating the land as public domain and from exercising authority over it as such.

Defendants moved to dismiss the bill, which motion was sustained, and plaintiff, electing to stand upon the bill, appealed to this court. On hearing, this court, in Pueblo of Santa Rosa v. Lane, 46 App. D. C. 411, sustained the bill as setting forth averments sufficient to establish that the plaintiff had, from time immemorial, consisted of Pueblo Indians, who were civilized, sedentary, agricultural, and pastoral, and who resided in permanent houses in a village of permanent location, built upon the lands described in the bill, which lands are situated in Pima county, Ariz. The court, in sustaining the bill, held in effect that the pueblo of Santa Rosa was a body corporate, with the right to sue and be sued, to own and hold property, real and personal, and to purchase and sell the same, subject only to the guardianship of the United States, as exercised generally over the Indian pueblos in New Mexico.

When the case was argued in this court, counsel for the defendants in open court announced that a final decree might be entered, inasmuch as the defendants did not desire to answer or plead further in the case below. Accordingly this court reversed the decree of the Supreme Court and remanded the cause, with "directions to enter a decree restraining defendants from offering for entry * * * or sale as part of the public domain of the United States any of said lands under any land or mineral land law of the United States, and requiring, in so far as lies" within the power "of the Land Department, to prevent in as large degree as possible any further infringement upon the property rights of plaintiff."

The case was appealed by defendants to the Supreme Court of the United States, and when it came on for hearing in that court the Solicitor General, on behalf of the defendant officers, notwithstanding the oral stipulation made in this court, insisted upon the right of the defendants to answer in the Supreme Court of the District. The court in its opinion (Lane v. Pueblo of Santa Rosa, 39 S. Ct. 185, 249 U. S. 110, 63 L. Ed. 504), sustained the bill as containing averments sufficient to establish that plaintiff is a pueblo, with all the rights, powers, and privileges pertaining thereto, but held that "the Court of Appeals ought not to have directed the entry of a final decree awarding a permanent injunction against the defendants. They were entitled to an opportunity to answer to the merits, just as if their motion to dismiss had been overruled in the court of first instance. By the direction given they were denied such an opportunity, and this was a plain and prejudicial error." The court accordingly reversed the decree of both courts, and remanded the case to the Supreme Court of the District, with directions to overrule the motion to dismiss, to afford the defendants an opportunity to answer the bill, and to grant an order restraining defendants from offering, listing, or disposing of the lands in question pending a final decree.

Defendants, on remand to the court below, filed another motion to dismiss the bill "for lack of authority on the part of the attorneys of record for the alleged plaintiff to represent their alleged client or to maintain this suit." On the same date defendants answered the bill, denying each of the material allegations therein contained, and thereafter the court entered an order postponing the decision on the motion to dismiss until the final hearing of the case on its merits. On final hearing, the motion to dismiss was overruled, and the court entered a decree on the merits, dismissing the bill. No appeal was taken by defendants from that portion of the decree overruling the motion, challenging the authority of counsel for plaintiff to represent their client. Plaintiff accordingly limited the present appeal to that portion of the decree dismissing the bill.

When this case came on for final hearing in the court below, there was a dual trial. The right of counsel to appear for plaintiff was challenged by a motion to dismiss the bill, and the issue of plaintiff's right to a decree was raised by answer to the bill. The court combined the case on the motion to dismiss and on bill and answer, and heard testimony thereon, both as to the merits and in support of the motion. The case was decided by denying the motion to dismiss and entering a decree for the defendants on the merits. The opinion of the court below was confined to holding in effect that counsel for plaintiff have no authority to represent it.

[1] It was error to hear the motion as a part of the case on its merits. A motion challenging the right of counsel to appear for a litigant in no way affects the merits of the case. This question can be raised by a procedure well known to the practice, namely, upon a preliminary motion, supported by affidavits setting forth the facts, and asking for a rule requiring counsel to show cause why the objections to his appearance should not be sustained. It cannot be raised by answer, or by a motion to dismiss in equity, since a plea goes to the merits of the case, while the proceeding challenging the authority of an attorney to appear is between different parties, and involves a preliminary matter collateral to the issue on the merits. It in no way affects the right of the party whose attorney is challenged, should the motion be sustained, to employ other and proper counsel to represent him in the further conduct of his case.

The rule is well stated in the case of Gage v. Bell (D. C.) 124 F. 371, 379, as follows: "Necessarily it is the practice in all courts to treat the attorney appearing for a litigant as duly authorized thereto by that litigant. The authority to appear must exist, to be sure; but it is conclusively presumed, or assumed, rather, by the court, unless it is formally, and by a special proceeding known to the practice, called in question. 3 Enc. L. (2d Ed.) 349, 375. The

defendant cannot by answer or plea, set up want of authority in the plaintiff's attorney, but he must make a rule upon him to show his authority, supported by affidavit as to the facts. Id. 377, citing Martin v. Walker, Abb. Adm. 579, Fed. Cas. No. 9,170; Howe v. Anderson (Ky. 1890) 14 S. W. 216; Hill v. Mendenhall, 21 Wall. 453, 22 L. Ed. 616. The reasons of this rule are well illustrated by this case. The courts could not conveniently do the business of litigation, if either litigant could capriciously embody in his pleadings the collateral matter of the authority of the attorneys, respectively, to appear and file their pleadings. Every litigation would degenerate into a preliminary inquiry about the attorney's dealings with his client."

[2, 3] Until the contrary is shown, counsel in a case will be presumed by the court to appear by proper authority, and this presumption cannot be removed by a collateral attack in the pleadings. It is a preliminary matter, to be disposed of before proceeding to the merits of the case. It was, therefore, not only improperly injected into the present case, but it came too late.

[4, 5] Coming to the case on its merits, the word "pueblo," as derived from its Spanish origin, is not enveloped in mystery, nor is it used or applied in any technical sense. It broadly means a small settlement or gathering of people, and applies equally, whether the settlement be a small collection of Spaniards or Indians. It was created as the result of communal occupation of land for a common purpose, originally occupied by the people through their own volition. A pueblo could thus be formed without any grant or charter. It means merely a settlement with a steady community. A pueblo is defined in the Partidas, law 1, book 2, law 5, as follows: "A pueblo is the name given to a community of people of every kind of the country where they are gathered together; and if for 10 or 20 years they have badly done anything by way of custom, the laws of the land knowing it, and not objecting, and approving, the pueblo, whatever it is, or the greater part of it can do that thing, and it must be held and protected by custom."

[6] The title of the Indian inhabitants of a pueblo in Mexico has been recognized, not only by the Mexican, but the Spanish, laws, and such recognition rests, not necessarily upon title by grant or charter from the crown, but it may be established and was frequently established by prescription. Prescriptive right, as against the crown, existed and was recognized by the Spanish laws. In Carino v. Insular Government, 29 S. Ct. 334, 212 U. S. 449, 53 L. Ed. 594, the court, considering the legality of titles established by prescription against the Spanish government in the Philippine Islands, said: "Prescription is mentioned again in the royal cedula of October 15, 1754, cited in 3 Philippines, 546: 'Where such possessors shall not be able to produce title deeds it shall be sufficient if they shall show that ancient possession, as a valid title by prescription.' It may be that this means possession from before 1700, but at all events the principle is admitted. As prescription, even against crown lands, was recognized by the laws of Spain, we see no sufficient reason for hesitating to admit that it was recognized in the Philippines in regard to lands over which Spain had only a paper sovereignty."

There can be no question, we think, that prior to the cession under the Gadsden Treaty the Papago Indians had acquired a title which was subject to recognition by the government of Mexico. It is conceded, however, that no proceedings were ever instituted to have this title established or made a matter of record; hence, with the cession to the United States, the Indians came to us with no paper title, with nothing more than the prescriptive right, which could have been exercised by them as recognized citizens of Mexico.

This brings us to the consideration of the main question in this case, whether or not this mere prescriptive right was so protected by the terms of the Gadsden Treaty, or the treaty of Guadalupe Hidalgo, as to be enforceable in the courts. Article 6 of the Gadsden Treaty, 10 Stat. 1035, after stating that "no grants of land within the territory ceded by the first article of this treaty," dated later than September, 1853, will be recognized as valid, continues, "or will any grants made previously be respected or be considered as obligatory which have not been located and duly recorded in the archives of Mexico."

On the former appeal the Supreme Court (39 S. Ct. 186, 249 U. S. 114, 63 L. Ed. 504), referring to the foregoing clause of the treaty, said: "In view of the very broad allegations of the bill, the accuracy of which has not been challenged as yet, we have assumed in what has been said that the plaintiff's claim was valid in its entirety under the Spanish and Mexican laws, and that it encounters no obstacle in the concluding provision of the sixth article of the

Gadsden Treaty, but no decision on either point is intended. Both involve questions not covered by the briefs or the discussion at the bar, and are left open to investigation and decision in the further progress of the cause."

It is urged, however, that the Papago Indians are secured in their rights under the Gadsden Treaty by the incorporation therein of article 9 of the treaty of Guadalupe Hidalgo of February 2, 1848, 9 Stat. 922. Article 9 of that treaty provides as follows: "Mexicans who, in the territories aforesaid, shall not preserve the character of citizens of the Mexican republic, conformably with what is stipulated in the preceding article, shall be incorporated into the union of the United States, and be admitted at the proper time (to be judged of by the Congress of the United States) to the enjoyment of all the rights of citizens of the United States, according to the principles of the Constitution, and in the meantime shall be maintained and protected in the free enjoyment of their liberty and property, and secured in the free exercise of their religion without restriction."

This in no way relates to the concluding provision of article 6 of the Gadsden Treaty, since the above provision refers to the right of Mexican citizens residing within the ceded territory to elect within one year whether they would remain citizens of Mexico or become citizens of the United States. This provision was merely to protect them, pending such election, in their liberty and property, and it placed no limit whatever upon the provision of the latter treaty here under consideration.

It follows that, had the record title been established in Mexico to which this pueblo was clearly entitled, it could not be divested by the sort of evidence adduced in this case. The mere recollection of aged Indians as to the present-day habits and customs of their people would not overcome the unanswerable record of rights accruing from time immemorial, as shown by Spanish and Mexican records and traditions, reviewed at length in our former opinion. 46 App. D. C. 411. However, the concluding clause of article 6 of the Gadsden Treaty, under the evidence adduced below, forbids relief by the courts. The power lies alone in Congress to extend to these people protection similar to that thrown around the pueblos of New Mexico, who were more fortunate than plaintiff, merely in that they possessed a paper title from Mexico.

The decree is affirmed, with costs.